## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 06-45-P-H** |
| | ) | |
| **SHANNON YONUSS,** | ) | |
| | ) | |
| **Defendant** | ) | |

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

Shannon Yonuss, charged with being a felon in possession of ammunition (forty-nine rounds of Remington .380-caliber ammunition) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), seeks to suppress statements he made and tangible evidence seized on or about July 14, 2005. *See* Indictment (Docket No. 13); Motion To Suppress Tangible and Derivative Evidence and Statements, Admissions, and Confessions ("Motion") (Docket No. 21). An evidentiary hearing was held before me on July 13, 2006 at which the defendant appeared with counsel and at the close of which counsel for both parties argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

### I. Proposed Findings of Fact

On July 14, 2005 Trevor Campbell, a special agent of the Central Maine Violent Crimes Task Force cross-deputized as a deputy United States marshal, received a call from Lieutenant Mailhot of the Lewiston Police Department ("LPD") requesting that Campbell assist in the LPD's efforts to locate

1

Derek Dube of the Lewiston/Auburn, Maine area, who was wanted on several outstanding warrants.[1]
Specifically, Mailhot asked Campbell to question Michelle Yonuss ("Michelle"), who that morning
had been stopped while driving a stolen vehicle with which Dube was believed to be associated.
Mailhot believed that Michelle, who had been taken into custody and was being held at the LPD
station in Lewiston, might have information regarding Dube's whereabouts.   Campbell, who
personally knew both Michelle and her husband, the defendant Shannon Yonuss, went to the station to
interview Michelle.   When Campbell was unable to learn Dube's whereabouts from Michelle, he
asked where he could find her husband.   Campbell thought it important to speak with the defendant,
whom he had known for fifteen years and with whom he felt he had developed a good rapport.   He
was hopeful that the defendant would tell him the truth – even if the truth in some way implicated the
defendant and/or Michelle.

Michelle told Campbell that her husband was at the couple's apartment at 104 Pierce Street in
Lewiston.   Campbell was familiar with that address; he understood, from previous calls to that
apartment, that it was the residence of Michelle, her husband and her mother-in-law Eleanor Yonuss
("Eleanor").[2]   Campbell and three LPD officers traveled to the Yonuss apartment at 104 Pierce Street.
 Campbell, who was not wearing a uniform, drove his unmarked vehicle, a 2004 Jeep Grand
Cherokee.   The LPD officers – Sergeant Kelly Hamel, Sergeant Michael Whelan and Detective James
Theiss – traveled in a marked police cruiser.   Hamel and Whelan were in uniform; Theiss, like
Campbell, was in plainclothes.   Upon exiting their cruiser Hamel, Whelan and Theiss surrounded the
building in case Dube, whom the officers considered a flight risk, was there.   Campbell walked up the

---

[1] Lieutenant Mailhot's first name was not provided.
[2] On cross-examination, Campbell admitted that (i) on July 14, 2005 Michelle told him only that she and the defendant resided at the
104 Pierce Street apartment, and (ii) he did not mention in his written reports that Eleanor also resided there.  However, I am satisfied
*(continued on next page)*

driveway toward the apartment building and spotted, through an open window, an older woman whom he recognized as Eleanor sitting in a chair in the living room.[3]  Campbell asked Eleanor if Shannon was home; Eleanor said he was.  Campbell asked if he could speak with him, and Eleanor said, "Yes, come around inside."

As Campbell walked the short distance to the entrance to the apartment building, he heard Eleanor calling the defendant's name.  Whelan joined Campbell, and both entered the building and knocked on the door to the Yonuss apartment.  The defendant answered the door, and Campbell asked if he could speak to him inside the apartment.  The defendant appeared extremely nervous, was dressed in shorts with no shirt, and appeared to Campbell possibly to be under the influence of narcotics.  However, he invited Campbell and Whelan in with no seeming reservations or problem. The officers stepped inside into a kitchen, and Campbell radioed Hamel and Theiss to let them know that he was inside the apartment and they could come in.  As Campbell began to speak with the defendant, Hamel and Theiss entered the apartment.  Theiss remained with Campbell while Whelan and Hamel swept through other rooms in the apartment, looking for signs of Dube.[4]  Theiss, who had been called to 104 Pierce Street many times during his sixteen years as an LPD detective, was acquainted with Michelle, Eleanor and the defendant.  Like Campbell, he understood 104 Pierce Street to be the residence of all three individuals.

As Eleanor continued to sit in a chair in the living room, which was open to the adjoining

---

that as of July 14, 2005 Campbell had acquired knowledge or a reasonable belief, based on prior visits to the Yonuss apartment, that it was occupied by the defendant, his wife and his mother.

[3] On cross-examination, Campbell acknowledged that in his later reports and affidavit describing this encounter, he wrote that he had spotted an older female sitting in a chair by the open window who was "later identified as Shannon's mother, Eleanor Yonuss." Campbell insisted (credibly) that he did in fact know that the older female was Eleanor, having been called to the apartment on prior occasions, although he was not able to explain why he had described her that way or who "later identified" her.  The verbiage in Campbell's report, in my view, reflects a stilted writing style rather than lack of contemporaneous knowledge of Eleanor's identity.

[4] The defendant put on a shirt soon after officers arrived.  Theiss recalled that the defendant was fully dressed when he entered the
*(continued on next page)*

3

kitchen area, Campbell, Theiss and the defendant stood talking in the kitchen and/or living room. At one point the defendant told Campbell he wanted all of the officers rounded up within his view because he was afraid they were going through his things. Campbell explained the officers' purpose; as far as Campbell could tell, no one was searching the defendant's belongings.

Campbell apprised the defendant that Michelle was at the police station and had been questioned in reference to receipt of a stolen vehicle and its connection to Dube. Campbell added that he was considering charging Michelle with receipt of stolen property. Campbell asked the defendant if he could provide him with any information leading to Dube's whereabouts.[5] The defendant, who appeared to Campbell to be worried about his wife, said that he did not know Dube's whereabouts and that he had bought the car from Dube via a deal that Samuel "Chubby" Warner, a mutual friend, had orchestrated. The defendant expressed anger with Warner for having sold him a stolen vehicle, going so far as to phone Warner in front of the officers and scream and yell at him for approximately a minute for having sold him a stolen car. Officers did not ask the defendant to place that call; the defendant chose to do so. Theiss had the impression that the defendant was putting on a deliberate show for the officers to make himself look good and to minimize the appearance of his involvement with the vehicle.

The defendant told Campbell that the previous day Warner, on Dube's behalf, had offered to sell the defendant the car for $500, which the defendant thought was a good deal. The defendant and Warner had arranged for pickup of the car the following morning (July 14, 2005). The defendant explained that after obtaining the car that morning, he and Michelle had driven it to a Wal-Mart store

---

apartment about a minute after Campbell and Whelan had.
[5] On cross-examination, Campbell admitted that he was investigating not only the whereabouts of Dube but also any possible involvement by Michelle or the defendant in the theft or illegal receipt of the vehicle, and that he did not believe Michelle had been
*(continued on next page)*

in Auburn, Maine. Theiss asked the defendant what the couple had purchased at Wal-Mart; the defendant replied that they had bought burn medication for Michelle. Theiss, who did not believe the defendant was telling the truth, asked if he could see the Wal-Mart receipt.[6] The defendant obtained a receipt and gave it to Theiss. The receipt reflected purchase of "380 CTG UMC," *see* Gov't Exh. 1, which both Theiss and Campbell recognized as a purchase of .380-caliber ammunition. Theiss then again asked the defendant what he bought at Wal-Mart; this time, the defendant replied, "Ammunition." Campbell queried where the ammunition was. The defendant said he had hidden it underneath a couch cushion. He then went to a couch and lifted a cushion, revealing a carton of ammunition. Campbell seized the carton and opened it, determining that one round was missing. He asked the defendant whether he was a felon. The defendant replied, "Trevor, you know I'm a felon from when I shot Soper." Campbell had been a corrections officer at the Androscoggin County Jail when the defendant was incarcerated there in connection with the shooting of Harold Soper. Campbell had spoken with the defendant at the time about that case, although he did not know whether the defendant had been convicted of a misdemeanor or a felony in connection therewith.

Campbell asked the defendant about the missing round. The defendant explained that he had dropped it on the floor in Wal-Mart. Campbell questioned where the firearm was for which the defendant had purchased ammunition. The defendant said Michelle kept it locked up, and he had no access to it. Campbell then asked the defendant if he would voluntarily accompany him to the police station for questioning. The defendant agreed. Campbell escorted the defendant to a marked police cruiser parked across the street. Campbell did not touch him but, rather, walked alongside him. When

---

honest with him during the earlier stationhouse interview.

[6] Theiss had another ulterior motive: to obtain the time stamp on the receipt. Theiss suspected that Dube himself might have accompanied the defendant to Wal-Mart and knew that Wal-Mart maintained an elaborate security videocamera system. Theiss had
*(continued on next page)*

they reached the cruiser Campbell patted the defendant down, per police policy.  Campbell did not offer to take the defendant in his Jeep because, for officer safety reasons, police policy is to use a cruiser (which has a cage) if available.[7]

After Campbell left the apartment with the defendant, Theiss asked Eleanor where the gun was. She inquired whether her son would be in trouble; Theiss told her that he would not be in any more trouble than he already was.  Eleanor said the gun was in her purse, which was on the floor by the window.  Theiss questioned how it got there; Eleanor said her son had put it there when police had arrived that morning.  Eleanor opened her purse.  Theiss advised that for officer safety he would remove the gun.  He reached into the purse, retrieved a gun and ensured it was unloaded.  He then exited the apartment and called out to Campbell, who walked back across the street to him, leaving the defendant standing at the cruiser.  Theiss handed Campbell the firearm and relayed the story Eleanor had told him.  After satisfying himself that the gun was unloaded, Campbell took custody of it.

Campbell began to walk back toward the cruiser, and was about five feet away from the defendant when the defendant volunteered that the firearm was not his.  Campbell told the defendant that he already knew that he (the defendant) had in fact possessed the firearm, having given it to his mother.  The defendant responded that he had done so because he did not want to get in trouble. Campbell said he would be sending the firearm out for fingerprinting, and the defendant remarked that his fingerprints would be on it.[8]

_____

asked the defendant when he and Michelle had been in Wal-Mart, but the defendant had said he could not recall.

[7] In a later report, Campbell wrote that he took the defendant outside and patted him down, "intending to arrest him for being a felon in possession of ammunition."  Campbell testified that his intention at that time was to arrest the defendant "in the future" for that crime. Campbell did not place the defendant under arrest that day.

[8] Theiss testified that while he was conversing with Campbell about the gun, he (Theiss) observed the defendant seated in the cruiser with a uniformed officer nearby.  It is not clear exactly when the defendant entered the cruiser; however, I find that he likely entered it after the conversation he had with Campbell regarding possession of the firearm.  Campbell testified that he was called away by Theiss just as he was patting the defendant down and that he was starting back toward the cruiser and was about five feet away from the
*(continued on next page)*

Whelan then transported the defendant to the police station in the cruiser, while Campbell followed in his Jeep.  A person seated in the rear of the cruiser cannot let himself out.  At the station, the defendant was taken to an interview room, where Campbell immediately read him *Miranda* warnings.[9]  The defendant stated that he understood his rights, initialing each of them on a written form that he and Campbell both signed.  *See* Gov't Exh. 3.  Campbell then provided a written statement, *see id.*, after which he was permitted to leave the station.  At no time on July 14, 2005 was the defendant handcuffed or told that he was under arrest.  Officers were in the Yonuss apartment for a total of fifteen to twenty minutes that day.

## II.  Discussion

The defendant seeks suppression of statements he made, and tangible evidence officers seized, on the bases that (i) officers illegally entered his apartment, (ii) he was subjected to custodial interrogation without benefit of required *Miranda* warnings, and (iii) his statements were not voluntarily made.  *See generally* Motion.  The government bears the burden of proving (i) the lawfulness of warrantless entry into a residence, s*ee, e.g., United States v. Romain*, 393 F.3d 63, 68-69 (1st Cir. 2004), (ii) *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and (iii) the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990).  For the reasons that follow, I find that the government meets its burden of demonstrating the lawfulness of the officers' conduct.

---

defendant when the defendant initiated that conversation.

[9] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

## A.  Entry into Apartment

In his papers and via counsel at hearing, the defendant challenged the legality of officers' entry into his home on July 14, 2005, asserting that (i) Eleanor Yonuss did not have either actual or apparent authority to consent to the entry of police into the Yonuss apartment, and (ii) his own purported consent was involuntary.  *See, e.g.,* Motion at 5-6.

"Valid consent renders a warrantless search [or entry] constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." *United States v. Perez-Montañez*, 202 F.3d 434, 438 (1st Cir. 2000).  "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." *Id*. (citation and internal quotation marks omitted).[10]  "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities." *Id*.  This interaction, in turn, is measured by a standard of "objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999) (citations and internal quotation marks omitted).

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share,

---

[10] While the question sometimes is framed as one of whether consent has been "freely and voluntarily" given, the concepts are equivalent. *See, e.g., United States v. Drayton*, 536 U.S. 194, 206 (2002) ("We turn now from the question whether respondents were seized to whether they were subjected to an unreasonable search, *i.e.,* whether their consent to the suspicionless search was involuntary."); *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) ("Consent is voluntary if it is the product of an essentially free and unconstrained choice.") (citation and internal quotation marks omitted).

authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 126 S. Ct. 1515, 1518 (2006). "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Id*. at 1520 (citation omitted).

When Campbell approached the Yonuss apartment, he recognized the older woman sitting in a chair by an open window as Eleanor Yonuss, whom he knew to be the defendant's mother. It was his understanding, based on a longstanding acquaintance with the defendant and previous visits to the residence, that Eleanor was a co-occupant of the apartment. Eleanor invited Campbell inside for the purpose of speaking with her son. Thus, Eleanor gave legally sufficient consent to the entry.

In any event, apart from Eleanor's consent, after Campbell and Whelan knocked on the door to the Yonuss apartment, the defendant himself answered. Campbell and Whelan did not make a claim that they had a right to enter, nor did the defendant's demeanor betray mere acquiescence to a show of authority. Although the defendant appeared very nervous, was not fully dressed and seemed (to Campbell) possibly to be under the influence of narcotics, he invited the officers in without hesitation. The defendant, who had a criminal record and was no stranger to law enforcement, knew Campbell personally and had achieved a good rapport with him in the past. Despite the defendant's nervousness, possible ingestion of narcotics and the distressing news that his wife was being held at the police station, his actions following the entry reflected conscious control over his environment: He asked that all the officers be rounded up in his presence, made a show of phoning Warner to scream at him for having sold him a stolen vehicle, and, at some point soon after Campbell's and Whelan's initial entry, finished dressing by putting on a shirt.

On the facts as I have proposed they be found, I conclude that (i) Eleanor, whom Campbell reasonably believed was a co-tenant of the Yonuss apartment with authority to give consent to entry,

voluntarily consented to the entry of police into that apartment, and, (ii) in any event, the defendant himself voluntarily consented to their entry.

### B. Asserted *Miranda* Violation

In his papers and via counsel at hearing, the defendant argued that he was subjected to custodial interrogation long before he was transported to the police station and accordingly should have been provided *Miranda* warnings much sooner than he was: prior to any questioning or, at the latest, as of the time he admitted paying $500 for the stolen car (thereby implicating himself in commission of the state-law crime of receiving stolen property). *See, e.g.,* Motion at 4-5. At hearing, defense counsel focused, in particular, on officers' persistence in asking questions that they assertedly knew would elicit incriminating responses (for example, whether the defendant was a felon).

Nonetheless, in the absence of a finding of custody, it is irrelevant whether an officer's comments or questions were reasonably likely to elicit incriminating information (*i.e.*, amounted to "interrogation"). *See, e.g., United States v. Vega-Figueroa*, 234 F.3d 744, 749 (1st Cir. 2000) ("In order for *Miranda* rights to be invoked, there must be (1) custody and (2) interrogation."). The custody determination, in turn, hinges not on whether the suspect felt "free to leave" but rather on "whether there was an arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Fernandez-Ventura*, 132 F.3d 844, 846 (1st Cir. 1998) (citation and internal quotation marks omitted). The suspect's and officers' subjective viewpoints are immaterial; what matters is "how a reasonable man in the suspect's position would have understood his situation." *United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (citation and internal quotation marks omitted). "Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement

10

officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

Pursuant to this test, even questioning of a suspect at a police station does not necessarily amount to "custodial" interrogation. *See, e.g., Quinn*, 815 F.2d at 160 ("Even when questioning occurs in the stationhouse, a suspect need not be given *Miranda* warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in 'custody.' In [*California v.*] *Beheler*[, 463 U.S. 1121 (1983)], an individual was questioned without *Miranda* warnings in the stationhouse after he had reported a homicide in which he was apparently involved. The police took him to the stationhouse but advised him he was not under arrest. Finding there had not been a restraint on freedom of movement such as is associated with formal arrest, the Court ruled that *Miranda* warnings were not needed.") (citation omitted).

In this case, consideration of the relevant factors weighs in favor of a conclusion that the defendant was not "in custody" for *Miranda* purposes at any time prior to entering the back seat of the cruiser on July 14, 2005. Four officers were present in the defendant's apartment during the majority of the interview there. However, only two – Campbell and Theiss – actually questioned the defendant. The two interviewing officers were dressed in plainclothes and knew the defendant personally; the lead interviewer, Campbell, had previously developed a good rapport with him. None of the four officers at any time drew a weapon, handcuffed the defendant or otherwise physically restrained him, nor did any of the officers state that he was under arrest or demand anything of him. The defendant was in familiar surroundings over which he exercised indicia of control while the officers were present, for example, phoning Warner and asking at one point that the officers be rounded up in his presence for reassurance that they were not going through his belongings. The interview was

11

relatively brief, lasting approximately fifteen to twenty minutes.  Campbell asked the defendant if he would voluntarily accompany him to the station for further questioning, and the defendant agreed. Campbell then walked side-by-side with the defendant to the patrol car outside but did not touch him. Campbell did pat him down upon reaching the patrol car but then left him briefly to talk to Theiss.

On the facts as I propose they be found, I determine that the defendant was not "in custody," for *Miranda* purposes on July 14, 2005 at any point prior to entering the cruiser.  There is no evidence that he was interrogated while being transported to the police station.  Campbell administered *Miranda* warnings immediately upon meeting him in an interview room there.  The government accordingly meets its burden of demonstrating that no custodial interrogation was undertaken in the absence of *Miranda* warnings.

### C.  Voluntariness of Statements

The defendant's final argument, set forth in his papers, is that his statements were not voluntarily made.  *See* Motion at 6-7.  Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments.  *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002).   In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will.  *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests,  "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).  *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

Here, again, the government meets its burden, demonstrating that police engaged in no abusive

tactics to coerce a confession from the defendant.  Four officers were present in the defendant's apartment; however, he was questioned only by two officers in plainclothes, one of whom he knew. There is no evidence that the two uniformed officers did anything other than conduct a visual inspection of the rooms and maintain a lookout for signs of the fugitive, Dube. While Campbell and Theiss asked pointed questions, neither demanded anything of the defendant, used force or threatened to use force against him.  The defendant's mother was present and remained seated in the living room during the fifteen to twenty minutes officers were in the apartment.

In addition, although the defendant was very nervous, possibly under the influence of narcotics and upset at news of his wife's detention at the police station, he was not so impaired that mere continued questioning, in the circumstances, could be characterized as an abusive or coercive practice. *See, e.g., United States v. Holmes*, 632 F.2d 167, 168-69 (1st Cir. 1980) (upholding district court's finding that defendant's statements were made voluntarily in case in which district court credited officers' testimony that, although defendant's breath revealed that he had been drinking, defendant's gait was normal, he did not stagger, and officers observed nothing in his demeanor to suggest that he did not understand what was going on or what he was doing).  As noted above, the defendant demonstrated a continued ability to exert control over his environment, asking that all the officers be rounded up in his presence, making a show of phoning Warner to scream at him for having sold him a stolen vehicle, and, at some point soon after Campbell's and Whelan's initial entry, finishing dressing by putting on a shirt.[11]

---

[11] Campbell informed the defendant at the outset of questioning that he (Campbell) was considering charging the defendant's wife with receipt of stolen property. However, Campbell had a good-faith basis for considering making such a charge – a circumstance in which courts have held that explicit or implicit threats to charge a loved one if a suspect does not confess do not amount to "coercion" for purposes of assessing the voluntariness of a confession. *See, e.g., Elam v. Gillis*, No. Civ.A.04-CV-04771, 2005 WL 555383, at *5 (E.D. Pa. Mar. 7, 2005) (rec. dec., *aff'd* Mar. 30, 2005) ("Even if petitioner could prove that the police informed him of his girlfriend's arrest with the intent to get a confession from him, it would not be enough to deem the confession involuntary. The police *(continued on next page)*

Nor were coercive or abusive tactics used to extract statements made by the defendant while outside his apartment or at the stationhouse.  Upon seeing Theiss give Campbell the weapon taken from Eleanor's purse, the defendant initiated a conversation with Campbell.  When the defendant and Campbell met in an interview room at the police station, Campbell immediately administered *Miranda* warnings, provided a written copy of those warnings and had the defendant initial each to indicate he understood it.  *See* Gov't Exh. 3.  The defendant then signed a waiver of rights indicating he was choosing freely to make a statement after having had his rights explained to him and having understood them.  *See id*.  Campbell at no time that day told the defendant that he was under arrest or handcuffed him, and the defendant was permitted to leave the station.

On the facts as I propose they be found, the government meets it burden of demonstrating the voluntariness of statements the defendant made to Campbell and other officers on July 14, 2005.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the defendant's motion to suppress evidence and statements be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral*

---

had probable cause to arrest petitioner's girlfriend at the time they told petitioner of the charges his girlfriend might be facing, by virtue of the fact that the drugs were found in her home.  Since the arrest of the girlfriend was lawful, the threat to prosecute her was not coercive."); *United States v. Contreras-Del Toro,* 892 F. Supp. 159, 160 (S.D. Tex. 1995), *aff'd,*129 F.3d 612 (5th Cir. 1997) ("A confession motivated by desire to extricate a friend or relative from a possible good-faith arrest is not involuntary.  What renders a confession involuntary is not *any* threat or promise, but rather a threat or promise of illegitimate action.") (emphasis in original) (citations omitted).

*argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 20th day of July, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

15